**FIFTH DIVISION
MCFADDEN, P. J.,
GOBEIL and PINSON, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**June 9, 2022**

# In the Court of Appeals of Georgia

A22A0448, A22A0449. THE STATE v. BERRIEN & vice versa.

PINSON, Judge.

Neil Berrien was indicted on one count of rape. Before trial, the trial court granted the defense's motion to suppress a pre-arrest statement Berrien made to investigators without first being given *Miranda*[1] warnings. The court also granted the State's motion under OCGA § 24-4-413 to admit evidence of a prior rape that Berrien was accused of. The State challenges the suppression ruling, and Berrien challenges the ruling admitting the evidence of the prior alleged rape.

We conclude that the trial court erred in granting Berrien's motion to suppress his statement. He gave that statement in a 45-minute pre-arrest interview conducted in an unlocked room at the police station at a time of his choosing. In addition, he was

---

[1] *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

not physically restrained, was told he was not being "accused of" anything, and he was given water, was allowed to keep his cell phone, and was left alone during a break. Although he would have needed assistance to leave the secured area of the building where the interview room was located, a reasonable person in Berrien's circumstances would not have perceived that he was in custody. So *Miranda* warnings were not required, and the failure to give them is not a basis for suppressing the statement. We therefore reverse the trial court's order granting the motion to suppress.

The trial court did not err, however, in its decision to admit evidence of the prior alleged rape. Although Berrien was not prosecuted for the alleged rape, the evidence the State has proffered would be enough to enable a jury to find by a preponderance of the evidence that Berrien committed that crime. And because the primary disputed issue here is the victim's consent, the trial court did not abuse its discretion in finding that the probative value of this other-act evidence was not substantially outweighed by its risk of causing unfair prejudice. We therefore affirm the trial court's order permitting the introduction of that evidence.

## Background

### (a) The Alleged Offense and Resulting Investigation

Berrien was indicted for rape after the victim, K. C., accused him of getting her intoxicated and having forcible intercourse with her. According to the State's proffer at a pretrial motion hearing, the victim reported to police that Berrien, with whom she had previously had an "on-and-off consensual sexual relationship," asked to come to her home one evening in June 2019. The victim agreed, and Berrien arrived late in the evening with two bottles of Sangria and a hookah. After finishing one glass of Sangria and starting another, the victim "began to feel as if she had no control over her body" and noticed that Berrien was looking at her "with . . . a sinister grin on his face." The victim alleged that Berrien helped her onto her bed, took off her pants, and began penetrating her vagina with his fingers. According to the victim, she asked him to stop, but he continued, and she felt "paralyzed" from the Sangria. Berrien held her in place and ultimately began "pounding" into her vagina with his penis, refusing to stop despite her repeated pleas and her effort to "block him with her hand." Afterward, the victim vomited and "began yelling at [Berrien] for what he'd done." He claimed he had done nothing wrong, and she then passed out. The next day, the victim reported the attack and underwent a sexual assault examination. According to

the victim, the nurse who examined her stated that she "had been raped with such force that her cervix had shifted."

About two weeks after the alleged rape, Berrien was interviewed by investigators with the Kennesaw Police Department. In the interview, which was recorded on video, Berrien admitted to having sex with the victim and acknowledged that he had continued to do so even after she told him twice to stop. An arrest warrant was issued the following day, and Berrien was later indicted.

*(b) Pretrial Proceedings*

Before trial, both Berrien and the State filed evidentiary motions. Berrien filed a *Jackson-Denno*[2] motion to suppress evidence of his statements to investigators. He argued in the motion that he was in custody at the time of his interview and thus should have been given *Miranda* warnings before being questioned. And the State filed a notice of intent to offer evidence of another alleged rape committed by Berrien, relying on OCGA § 24-4-413.[3] .

---

[2] *Jackson v. Denno*, 378 U. S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

[3] Under OCGA § 24-4-413 (a), when "the accused is accused of an offense of sexual assault, evidence of the accused's commission of another offense of sexual assault shall be admissible and may be considered for its bearing on any matter to which it is relevant."

4

Both motions were argued at a pretrial hearing.

*(1)* Jackson-Denno *Motion*

For the *Jackson-Denno* motion, the State presented the testimony of one of the interviewing officers, Detective Michael Alvarez, and introduced the video recording of Berrien's interview, which was played for the trial judge. Before interviewing Berrien, Detective Alvarez had interviewed the victim and several other witnesses, including the victim of the prior alleged rape. He had also reviewed the sexual-assault-examination report, which showed injuries resulting from the alleged attack on K.C.

Detective Alvarez testified that he called Berrien on July 10, 2019 and asked him to come to the police station annex for an interview on July 12. Berrien agreed but then called back to ask if he could come sooner, and Detective Alvarez agreed to meet that afternoon. When Berrien arrived at the annex building, Detective Alvarez met him in the waiting room, which was separated from the rest of the building by a locked door. Detective Alvarez escorted Berrien down the hall to an interview room, where another detective was waiting to help conduct the interview, and shut the door behind them. Detective Alvarez could not recall whether that door had a lock, but in

5

the video the door appears not to have one, and the detectives are shown freely opening and closing the door without locking or unlocking it.

Detective Alvarez testified that Berrien was a suspect at the time he was interviewed. He acknowledged that Berrien was not given *Miranda* warnings before or during the interview, explaining that this was because Berrien "was not in custody." As Detective Alvarez testified and as the video confirms, Berrien was not told that he was under arrest, or that he was not under arrest, and there was no discussion at any time of whether he was free to leave. But at one point during the latter half of the interview, one of the detectives implied Berrien would be leaving, stating, "I don't want you to walk out of here and us not be clear about" what happened.

The interview lasted approximately 45 minutes. Berrien told the officers that he had gone to the victim's apartment with a hookah and some wine and that, after drinking and talking, they began kissing and then had sex. He denied intending to have sex against the victim's will, but he did eventually admit that she had told him to stop at least twice. As Berrien's account of events unfolded, the officers told him several times that they already "[knew] what happened," but that there were "some things" they needed him "to fill in." They asked whether he had "[made] a mistake,"

6

positing, for example, that perhaps he had "[had] a little too much to drink and [gotten] carried away." They also informed him that they had received "medical information" indicating that the victim was "pretty hurt." After hearing this, Berrien remarked, "I feel like I'm being cornered." In response, one of the detectives told Berrien they were "not accusing" him.

The video shows that, during the interview, Berrien was sitting in a chair against the wall, diagonal from the closed door. The second detective was seated next to the door, and Detective Alvarez, who can be heard but not seen during the interview, appears to be situated across from Berrien. Berrien was not handcuffed or otherwise physically restrained, and he had his cell phone with him during the interview, including during a brief break when the detectives left him alone in the room. Berrien had a cup of water with him during the interview, which he was permitted to refill during the break. When the interview was finished, Berrien left in his own car, which was parked behind the annex building during the interview.

The evidence is unclear about whether Berrien was able to exit the building on his own. Although the annex building had a side door leading outside, which Detective Alvarez believed was unlocked from the inside, Alvarez could not recall whether Berrien had exited through that door or through the door leading back into

the waiting room. As to the latter door, Detective Alvarez first said that he "[didn't] believe" there was a code required to open it from the inside, but when further pressed on this subject, he replied, "I don't recall."

*(2) Prior Sexual Assault Evidence*

As for the OCGA § 24-4-413 motion, the State made a proffer as to Berrien's alleged rape of another victim, S. R. According to the proffer, S. R. went to the Cartersville Medical Center in February 2019 for a sexual-assault examination. She reported to police that the previous night, Berrien, whom she described as a "friend" that she had known "for about a month," had come to her apartment to have drinks and smoke marijuana. She recalled falling asleep with her clothes on, but woke up the next morning in her bed, unclothed, "[feeling] like she had had sex." When Berrien was later interviewed by police, he admitted to having sex with S. R., but he claimed it was consensual. The police ultimately declined to bring charges.

In response to the State's proffer of S. R.'s accusation, the defense offered the police report and the sexual assault nurse examiner (SANE) report from the incident. After detailing the victim's allegations and Berrien's statements to police, the police report concludes that the case was being closed "[d]ue to lack of probable cause" that a crime was committed. The SANE report reflects S. R.'s statements to the police and

the nurse examiner that she did not remember what had happened after she fell asleep and that she had vomited at some point during the evening. The SANE report indicates that there were no "assault-related findings" from the exam.

*(3) Evidentiary Orders*

Following the hearing, the trial court, in separate orders, granted Berrien's *Jackson-Denno* motion and the State's OCGA § 24-4-413 motion.

For the *Jackson-Denno* motion, the trial court concluded that, at the time of his interview, Berrien was in custody and thus *Miranda* warnings should have been given. In support of this conclusion, the court cited its findings that Berrien was the only suspect at the time of the interview; that access into and out of the police annex where the interview took place was restricted, such that Berrien had to be "let in" and "let out" of the building; that the interview room itself "was locked behind Mr. Berrien" and "the doors to leave the room were behind one of the officers involved in the interview"; and that Detective Alvarez told Berrien during the interview "he already knew what happened" but "never told Mr. Berrien that he was not under arrest or that he was free to leave." Under these circumstances, the court concluded, a reasonable person would have believed he was in custody, and therefore *Miranda* warnings were required.

9

As for the OCGA § 24-4-413 motion, the court concluded that the evidence of Berrien's prior alleged sexual assault against S. R. was "properly admissible . . . to show [Berrien's] propensity to commit" the crime charged here. In reaching this conclusion, the court found that the probative value of the evidence was not substantially outweighed by the danger of undue prejudice.

The State appealed the grant of the motion to suppress,[4] and Berrien cross-appealed the OCGA § 24-4-413 ruling.

Discussion

*Case No. A22A0448*

1. In its appeal, the State contends that the trial court erred in concluding that Berrien was in custody at the time of his police interview, and so the court erred in suppressing the statements he made during the interview.

"A person is considered to be in custody and *Miranda* warnings are required when a person is (1) formally arrested or (2) restrained to the degree associated with a formal arrest. Unless a reasonable person in the suspect's situation would perceive that he was in custody, *Miranda* warnings are not necessary." *State v. Troutman*, 300

_____

[4] See OCGA § 5-7-1 (a) (5) (permitting State's appeal from an order excluding certain evidence the State seeks to offer at trial).

10

Ga. 616, 617 (1) (797 SE2d 72) (2017) (citation and punctuation omitted). Put another way, whether a person is "in custody" for *Miranda* purposes depends on "whether a reasonable person in the suspect's situation would perceive that he was at liberty to terminate the interview and leave." *Drake v. State*, 296 Ga. 286, 289 (1) (766 SE2d 447) (2014). In making this determination, courts must consider the totality of the circumstances, viewed from the standpoint of a reasonable person, "without regard for the subjective views of the suspect or the interrogating officer." *State v. Walden*, 311 Ga. 389, 390 (858 SE2d 42) (2021) (citation and punctuation omitted). To this end, courts look at things like the location and duration of the questioning, statements made during the interview, and whether the suspect was physically restrained during, and released after, the questioning. Id.

This "in custody" question is a mixed question of fact and law. *Walden*, 311 Ga. at 390. In reviewing the trial court's ruling on this issue, we accept the trial court's findings on disputed facts and credibility of witnesses unless they are clearly erroneous. Id. We may also consider facts that are "'indisputably discernible'" from the video recording. *State v. Abbott*, 303 Ga. 297, 299 (1) (812 SE2d 225) (2018). We then apply the relevant legal principles to these facts de novo. *Walden*, 311 Ga. at 390. Many of the relevant facts here are undisputed, and most of the undisputed

11

facts support the conclusion that Berrien was not in custody during the interview. Detective Alvarez called Berrien to request that Berrien come for an interview, and suggested their meeting take place two days later—hardly the type of request that would be expected if Berrien was being detained. Berrien agreed, even requesting to meet sooner than initially proposed, and he drove himself to the interview. The interview lasted less than an hour, and Berrien was not denied necessaries like food, water, or a bathroom break. Berrien was also told he was not being "accused of" anything, and he was not told he was under arrest or not free to leave—in fact, more than halfway through the interview, one of the detectives alluded to Berrien's "walk[ing] out of here." And Berrien did leave at the end of the interview, in his own car.

The primary factual dispute centers on Berrien's ability to exit the interview and leave the premises at will. On this issue, we accept the trial court's finding that Berrien had to be "let out" of the doors of the building, but we must reject its finding that the door to the interview room was locked and "behind" one of the detectives.

The only evidence on the status of the building doors was the testimony of Detective Alvarez. He equivocated on whether the door leading back through the waiting room required a passcode, and although he recalled that the side exit door

12

was unlocked, he did not say whether Berrien knew about that door. Based on this evidence, the trial court concluded that Berrien had to be "let out" of the building. Because these "legally significant facts were proved by evidence other than the video recording, the trial court as fact-finder was entitled to determine the credibility and weight of that other evidence." *Abbott*, 303 Ga. at 299 (1). So we defer to the trial court's finding.

But we must reject the trial court's findings that the door to the interview room was locked and "behind" a detective. If an appellate court can definitively discern material facts exclusively from a video recording, "no deference to [the] findings of [the] trial court" on those issues is required. *Hughes v. State*, 296 Ga. 744, 746 n.5 (770 SE2d 636) (2015) (citing *Vergara v. State*, 283 Ga. 175, 178 (1) (657 SE2d 863) (2008)). Accord *Walden*, 311 Ga. at 395 (noting that because defendant's encounter with law enforcement was documented on video recordings, the Court "review[s] that evidence de novo"). In the video of the interview, the door appears not to have a lock, and the detectives are clearly shown freely opening and closing the door without locking or unlocking it. And although the video shows that Berrien would have had to walk past the second detective to leave the room, the door was clearly not "behind" that detective.

13

So, for purposes of our review, the evidence about Berrien's ability to leave shows that Berrien was neither locked in the interview room nor blocked from its door, but that he would have needed assistance to leave the building. These circumstances alone do not establish that Berrien was in custody. Our Supreme Court has held, for example, that a defendant was not in custody even though he was interviewed in a secure section of the sheriff's office where guests were not allowed to move about unaccompanied, because other circumstances indicated that he was free to leave. *State v. Rumph*, 307 Ga. 477, 479, 481-82 (837 SE2d 358) (2019). Similarly, a defendant was not in custody when he was interviewed in a monitored back room of the police station, because other circumstances would have led him to believe he was free to leave. *Ward v. State*, 313 Ga. 265, 274-75 (4) (b) (869 SE2d 470) (2022). Because the relevant inquiry is whether the *totality* of the circumstances would lead a reasonable person to believe he was not free to leave upon request, *Drake v. State*, 296 Ga. at 289 (1), the mere fact that the questioning took place in a limited-access room in a police station is not enough to establish that Berrien was in custody.

Nor does the fact that Berrien was a suspect at the time he was interviewed necessarily establish that he was in custody. The question "is not whether the

14

investigators believed the appellant [was] a suspect but rather . . . whether a reasonable person in the appellant's position would have believed his freedom was restrained." *Grayer v. State*, 282 Ga. 224, 229 (3) (647 SE2d 264) (2007). Even the fact that a defendant was the "prime suspect" at the time of the questioning does not establish that the defendant was in custody for *Miranda* purposes, as long as a reasonable person would have believed he was free to leave. *Tolliver v. State*, 273 Ga. 785, 786 (546 SE2d 525) (2001). And here, even if the detectives became more convinced as the interview progressed that they had probable cause to arrest Berrien, an intent to arrest in the future is irrelevant to the custody determination "unless the police communicate [that] intent during the course of the interrogation." *State v. Billings*, 303 Ga. App. 419, 421 (693 SE2d 627) (2010). No such intent to arrest was communicated to Berrien here. To the contrary, the detectives alluded to his "walk[ing] out of here," even after he admitted that he continued having sex with the victim after she told him to stop.

Considering the totality of the circumstances outlined above, we conclude that Berrien was not in custody at the time of his interview. Berrien drove himself to and from the interview, which was scheduled at a time of his choosing, and he was interviewed for less than an hour, free of physical restraints in an unlocked room,

where he was allowed to keep his cell phone and was left alone for a break. He was told during the interview that he was not being "accused of" anything, and one of the detectives even made reference to Berrien's leaving the station after the interview. Although he would have needed assistance to leave the building, a reasonable person in Berrien's shoes would have perceived that he was free to end the interview and leave. See *Drake*, 296 Ga. at 289 (1). See, e.g., *Acosta v. State*, 311 Ga. 320, 321-23 (1) (a) (857 SE2d 701) (2021) (defendant was not in custody when, among other things, he agreed to accompany investigators to the police station to be interviewed, was not physically restrained, and was allowed to keep and use his phone); *Harper v. State*, 310 Ga. 679, 683 (2) (853 SE2d 645) (2021) (defendant was not in custody when, among other things, he agreed to go with officers to police headquarters, was not handcuffed or threatened, and was allowed to leave after the hour-long interview).

Because Berrien was not in custody for his interview, he was not entitled to a *Miranda* warning at that time, and the failure to give that warning was not a valid basis for suppressing his statements made during the interview. See, e.g., *Walden*, 311 Ga. at 395-96. It was error to conclude otherwise.

2. In his cross-appeal, Berrien contends that the trial court erred in admitting evidence of his alleged sexual assault on S. R. under OCGA § 24-4-413. He contends that the evidence is not relevant and will be unduly prejudicial, noting that investigators declined to pursue criminal charges.

Code Section 24-4-413 generally allows the prosecution in a sexual-assault case to offer "evidence of the accused's commission of another offense of sexual assault" for its bearing on "any matter to which it is relevant," id. at (a), including the defendant's propensity to commit sexual assault. *Dixon v. State*, 350 Ga. App. 211, 213 (1) (828 SE2d 427) (2019).[5] This provision creates "a rule of inclusion, with a strong presumption in favor of admissibility." *Dixon*, 350 Ga. App. at 213 (1) (citation and punctuation omitted). At the same time, in considering extrinsic evidence of another offense, the trial court must balance the relevance of the evidence against its potential to cause unfair prejudice to the defendant. Id. at 213-14 (1); see also OCGA § 24-4-403 (evidence otherwise admissible may still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice"). This

---

[5]An "offense of sexual assault" includes "any conduct . . . that would be a violation of" specified Code sections defining sexual offenses, including rape and sexual battery. Id. at (d) (1).

17

balancing requires "a common sense assessment of all the circumstances surrounding the extrinsic offense, including prosecutorial need, overall similarity between the extrinsic act and the charged offense, as well as temporal remoteness." *Dixon*, 350 Ga. App. at 214 (1) (citation and punctuation omitted). On appeal, a trial court's decision to admit evidence of this nature is reviewed only for abuse of discretion. Id. at 213 (1).

(a) Berrien first contends that evidence about S. R.'s sexual-assault allegation is not relevant because he was never charged with any crime and thus "there was no evidence presented that an offense of sexual assault occurred." This argument is directly refuted by our precedent, which holds that "'criminal charges are not required for the admission of other acts evidence'" under OCGA § 24-4-413. *Latta v. State*, 341 Ga. App. 696, 700 (2) (802 SE2d 264) (2017) (in child molestation case, witness's testimony about defendant's previous acts of molestation, which were reported to police but never charged as crimes, was admissible) (citation omitted). Accord *Dixon v. State*, 341 Ga. App. 255, 259 (1) (a) (800 SE2d 11) (2017) (evidence of defendant's prior act of sexual battery, which was reported but never charged, was admissible in child molestation case). Rather, it is enough that the evidence would enable a jury to find by a preponderance of the evidence that the defendant committed

18

the other offense. *Latta*, 341 Ga. App. at 700-01 (2); *Dixon*, 341 Ga. App. at 259 (1) (a). And that standard is met here. The State proffered S. R.'s testimony detailing the assault, and the police report reflects that Berrien admitted he had sex with S. R. on the night in question. If offered at trial, this evidence would be sufficient for a jury to find by a preponderance of the evidence that Berrien had non-consensual sex with S. R. while she was intoxicated and unconscious. See *Dixon*, 341 Ga. App. at 258-59 (1) (a) (even a single witness's uncorroborated testimony can provide adequate basis for jury to find that prior act occurred). Because this evidence bears on Berrien's propensity to engage in non-consensual sex, it would be relevant here, where consent is an essential element of the charged offense, see OCGA § 16-6-1 (a) (1), and is the primary issue in dispute.

(b) Berrien also contends that the evidence should be excluded under OCGA § 24-4-403 because its probative value will be substantially outweighed by the risk that it would unfairly prejudice him at trial.

The probative value of this evidence is substantial. The probative value of specific evidence depends on two things: (1) the need to establish the fact for which the evidence is offered, which in turn depends on that fact's significance in the case and whether or not that fact is disputed, and (2) the "marginal worth" of the evidence

in establishing the fact, which depends on what other evidence is available. *Olds v. State*, 299 Ga. 65, 75-76 (2) (786 SE2d 633) (2016). Here, the issue of consent is both essential and disputed, so the need to establish this fact is strong. And the marginal worth of the other-act evidence is high because the other available evidence on consent just pits the victim's word against Berrien's. See *Benning v. State*, 344 Ga. App. 397, 402 (810 SE2d 310) (2018) (where defendant claimed consent, need for other-act evidence to bolster the victim's credibility was high). See also *Latta*, 341 Ga. App. at 702 (2) (evidence of prior sexual offense was probative in rebutting defendant's claim that the act of which he was accused was an accident).

On the other side of the ledger, the risk of *unfair* prejudice from this evidence is relatively low. "Prejudice is not 'unfair' simply because it tends to inculpate the defendant in an awful crime" but only if it creates an "undue tendency to suggest decision on an improper basis [such as] an emotional one." *Morgan v. State*, 307 Ga. 889, 897 (3) (c) (838 SE2d 878) (2020) (citation and punctuation omitted). The four-month time span between the prior act and the crime charged here was short and so does not support a finding of undue prejudice. And the similarity between the two incidents—each involving allegations that Berrien had sex with unconscious victims who had become intoxicated in his company—minimizes the risk of inflaming the

20

jury based only on the accused's general propensity towards criminality. See *Dixon*, 350 Ga. App. at 214 (1) (holding that prior acts of child molestation were sufficiently similar to charged crime of child molestation, where all acts involved a similar manner of touching victims, all of whom were family members who were around the same age at the time of the incidents); *Benning*, 344 Ga. App. at 402 (holding that prior sexual assaults were similar enough to charged crimes where they all involved victims who were unconscious, barely conscious, or asleep); *Latta*, 341 Ga. App. at 702 (2) (holding that prior act of sexual battery was sufficiently similar to charged crime of child molestation, where both involved the defendant's inappropriate touching of a vulnerable person, which the defendant claimed was accidental, while the defendant was working at a job site).

Given the above, the trial court's determination that this evidence was admissible under OCGA § 24-4-413 was not an abuse of discretion.

*Judgment affirmed in Case No. A22A0449 and reversed in Case No. A22A0448. McFadden, P. J., and Gobeil, J., concur.*